CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
ANGELA C. C. VIRAMONTES (Bar No. 228228)
(E-Mail: angela_viramontes@fd.org)
YOUNG J. KIM (Bar No. 264195)
(E-Mail: young_kim@fd.org)
Deputy Federal Public Defenders
3801 University Avenue, Suite 700
Riverside, California  92501
Telephone:  (951) 276-6346
Facsimile:  (951) 276-6368

Attorneys for Defendant
MARTRELL PATRICK SHAW

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>     v.<br><br>MARTRELL PATRICK SHAW,<br><br>       Defendant. | Case No. ED CR 21-191-JGB<br><br>**MARTRELL PATRICK SHAW'S SENTENCING MEMORANDUM; EXHIBITS**<br><br>**Sentencing Date and Time:**<br>Jan. 29, 2024 at 2:00 p.m. |

# TABLE OF CONTENTS

Page

1    I. INTRODUCTION ....................................................................................... 1

2    II. DISCUSSION ........................................................................................... 1

3         18 U.S.C. § 3553(a) Is the Applicable Standard of Review ................... 1

4         A.    Guideline Calculation and Recommended Conditions of Supervised
               Release .......................................................................................... 2
5
          B.    History and Characteristics ........................................................... 3
6
               1.    Family Structure ................................................................. 3
7
8              2.    Mr. Shaw had an early childhood marred by poverty,
                     community violence, and familial instability ...................... 4
9
               3.    Mr. Shaw's instability at home likely impacted his academic
10                   performance ........................................................................ 6

11             4.    Mr. Shaw's Family is Plagued with Multigenerational Trauma ....... 6

12                   a.    Ms. Jones' Traumatic History ................................. 6

13                   b.    Mr. Martin Shaw's Traumatic History ................... 8

14                   c.    Mr. Martrell Shaw's Trauma History...................... 9

15             5.    Mr. Shaw's Plans for the Future ........................................ 13

16        C.    Nature of the Offense .................................................................. 14

17        D.    Needed Treatment ....................................................................... 16

18             1.    Substance Abuse Treatment ............................................... 16

19             2.    Mental Health Treatment ................................................... 16

20             3.    Medical Treatment ............................................................. 17

21        E.    Deterrence ................................................................................... 17

22   III. CONCLUSION...................................................................................... 19

23

24

25

26

27

28

## TABLE OF AUTHORITIES

Cases                                                                    Page(s)

*Gall v. U.S.*,
    128 S. Ct. 586 (2007)...........................................................................2

*Johnson v. Texas*,
    509 U.S. 350 (1993)..........................................................................13

*Kimbrough v. U.S.*,
    128 S. Ct. 558 (2007)...........................................................................2

*Nelson v. U.S.*,
    129 S. Ct. 2 890 (2009)........................................................................2

*Rita v. U.S.*,
    127 S. Ct. 2456 (2007).........................................................................2

*Roper v. Simmons*,
    543 U.S. 551,569 (2005) ...................................................................13

*Spears v. U.S.*,
    129 S. Ct. 840 (2009)...........................................................................2

*U.S. v. Booker*,
    543 U.S. 220 (2005).............................................................................2

*United States v. Lora*,
    559 U.S. 453 (2023) ........................................................................2, 3

**Statutes**

18 U.S.C. § 924.....................................................................................2, 3

18 U.S.C. § 1951......................................................................................2

18 U.S.C. § 3553..............................................................................1, 2, 16

18 U.S.C. § 3582......................................................................................2

18 U.S.C. § 3661......................................................................................2

U.S.S.G. § 2A1.1......................................................................................3

U.S.S.G. § 2B3.1......................................................................................3

U.S.S.G. § 2K2.1......................................................................................3

## <u>TABLE OF AUTHORITIES</u>

Cases                                                                                                     Page(s)

U.S.S.G. § 3D1.2 ...................................................................................3

**Other Authorities**

Andrew von Hirsch et al., *Criminal Deterrence and Sentence Severity: An*

    *Analysis of Recent Research,* summary available at

    http://members.lycos.co.uk/lawnet/SENTENCE.PDF

    Hart Publishing, Oxford (1999)...................................................17, 18

Center for Disease Control and Prevention, *Adverse Childhood Experiences*

    *(ACEs)*, https://www.cdc.gov/violanceprevention/aces/index.html

    (Jan. 18, 2024) ...................................................................11

Center for Disease Control and Prevention,

    https://www.cdc.gov/mmwr/volumes/72/su/su7201a3.htm#suggestedcit

    ation (Jan. 18, 2024) ............................................................12

Christopher R. Harper, PhD et al., *Witnessing Community Violence, Gun*

    *Carrying, and Associations with Substance Use and Suicide Risk*

    *Among High School Students - Youth Risk Behavior Survey,*

    United States, 2021 ............................................................12

Kedren Health, *Homepage* (Jan. 17, 2024);

    available at https://www.kedren.org/#..........................................8

James A. Reavis, PsyD et al., *Adverse Childhood Experiences and Adult*

    *Criminality: How Long Must We Live before We Possess Our Own*

    *Lives?*

    The Permanent Journal, Vol. 17, 1 (June 1, 2023). .......................11, 12

Michael Tonry, *Purposes and Functions of Sentencing*

    34 Crime & Just. 1 (2006) ...................................................17, 18

Mohammadreza Azadfard, Martin R. Huecker, James M. Leaming: *Opioid*

    *Addiction,* National Library of Medicine,

    (Jan. 18, 2024) https://www.ncbi.nlm.nih.gov/books/NBK448203...................16

## **TABLE OF AUTHORITIES**

Cases                                                                                                       Page(s)

Phyllis J. Newton, Jill Glazer, & Kevin Blackwell, Gender, *Individuality*
   *and the Federal Sentencing Guidelines*
   8 Fed. Sent'g Rep. 148 (1995)............................................................................18

Shanta R. Dube, et al., *Childhood Abuse, Neglect, and Household*
   *Dysfunction and the Risk of Illicit Drug Use: The Adverse Childhood*
   *Experiences Study, Pediatrics,*
   Vol. 111, 564 (2003)........................................................................................12

Shirley R. Klein et al., *Inmate Family Functioning,*
   46 Int'l J. Offender Therapy & Comp. Criminology 95 (2002).........................18

Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm:*
   *Restorative Justice and White Collar Crime*
   8 Cardozo J. Conflict Resol. 421 (2007) .........................................................17

iv

# I. INTRODUCTION

Mr. Martrell Shaw was born into instability. When Mr. Shaw was born, his mother had already lost custody of four children due to her substance use disorder. His father had two children and was divorced due to domestic violence and his substance abuse disorder. Growing up, Mr. Shaw's mother struggled to meet the immediate needs of her six children on a single income. Often they lived in a single motel room for months at a time. Other times, they lived with family and friends when they had nowhere to go. When Mr. Shaw's father was incarcerated, Mr. Shaw's mother was left to raise six children by herself. When Mr. Shaw's father was home, the financial onus was still on Mr. Shaw's mother and compounded by burden of caring for and supporting a spouse struggling with addiction. Mr. Shaw experienced many traumatic events stemming from chronic homelessness, his father's repeated incarceration, familial mental illness in the home, familial substance use disorders in the home, deaths of family and friends, intra-familial violence, and community violence. At 18-years-old, without any treatment to process his lifetime of trauma or the maladaptive behaviors modeled for him, Mr. Shaw found himself reeling from recently being shot and losing his brother. He numbed himself all day, every day with a potent mix of marijuana and oxycontin. Mr. Shaw found himself doing and saying things he never did before, including this offense and his actions after.

# II. DISCUSSION

## 18 U.S.C. § 3553(a) Is the Applicable Standard of Review

The Court is not bound by the Guidelines. Rather, the Court must consider the guidelines, along with other factors of equal weight, to arrive at a reasonable sentence. *See* 18 U.S.C. § 3553(a). The Supreme Court has consistently held that federal judges should impose sentences that are not greater than necessary to satisfy the statutory purposes of sentencing, consider all of the characteristics of the offender and circumstances of the offense, reject advisory guidelines that are not based on national sentencing data and empirical research, and serve their function in the constructive

evolution of responsible guidelines. *See U.S. v. Booker*, 543 U.S. 220 (2005); *Rita v. U.S.*, 127 S. Ct. 2456 (2007); *Gall v. U.S.*, 128 S. Ct. 586 (2007); *Kimbrough v. U.S.*, 128 S. Ct. 558 (2007); *Spears v. U.S.*, 129 S. Ct. 840 (2009); *Nelson v. U.S.*, 129 S. Ct. 2 890 (2009).

The applicable sentencing statutes provide that a sentencing court "shall impose a sentence sufficient, but not greater than necessary" to achieve the objectives of sentencing. See 18 U.S.C. §§ 3553(a), 3582(a), and 3661. In arriving at the appropriate sentence, § 3553(a) directs sentencing courts to consider: (1) the nature and circumstances of the offense; (2) the history and characteristics of the offender; (3) the need to impose a punishment that reflects the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense; ( 4) to afford adequate deterrence; (5) to protect the public from further crimes; (6) to provide the defendant with needed education, vocational training, medical care or other correctional treatment; and (7) the kinds of sentences that are available. 18 U.S.C. § 3553(a)(l), (2).

## A.     Guideline Calculation and Recommended Conditions of Supervised Release

On Dec. 4, 2023, the parties filed Stipulation re: Sentencing on Count Three of Second Superseding Indictment in Light of *United States v. Lora*, 559 U.S. 453 (2023). (Dkt. 123). The parties agree and stipulate that under *Lora*, the Supreme Court ruled that the bar on concurrent sentences in 18 U.S.C. § 924(c) (Using, Carrying, Brandishing, and Discharging a Firearm During and in Relation to, and Possession of a Firearm in Furtherance of, A Crime of Violence) applies only to that section and does not apply to convictions under 18 U.S.C. § 924(j) (Violation of 18 U.S.C. § 924 (c) Causing the Death of a Person through Use of a Firearm). *Id*. Accordingly, at sentencing, the government agrees to strike the charge of 18 U.S.C. § 924(c) from Count Three of the Second Superseding Indictment and request that the Court sentence Mr. Shaw for Interference with Commerce by Robbery in violation of 18 U.S.C. § 1951(a) (Count Two) and Discharging a Firearm During and in Relation to a Crime of

2

Violence, Resulting in Death in violation of only 18 U.S.C. § 924(j)(1) (Count Three). *Id*. By striking 18 U.S.C. § 924(c) from Count Three of the Second Superseding Indictment, the bar on concurrent sentences and the ten-year mandatory minimum will not apply to Count Three. *Id*. The statutorily authorized maximum sentence for Count Three is "imprisonment for any term of years or for life." 18 U.S.C. § 924(j)(1).

Mr. Shaw has no objections to the calculation of his criminal history score as zero, or his criminal history category as I. PSR ¶¶ 45-48.

In terms of Count Two, Mr. Shaw has no objections to the USPO's calculation of his base offense level as 43 under U.S.S.G. §§2A1.1(a) and 2B3.1(c)(1). PSR ¶ 31. In terms of Count Three, given *Lora* and the parties' stipulation, Count Three is not a count for which the statute mandates a consecutive sentence. Accordingly, Count Three should group with Count Two because they involve substantially the same harm in that they involve the same victim and the same act or transaction. U.S.S.G. §3D1.2(a). For Count Three, the base offense level is 43. U.S.S.G. §2K2.1(c), U.S.S.G. §2A1.1(a). Mr. Shaw concurs his base offense level should be decreased by three for acceptance of responsibility. PSR ¶¶ 38-39. Thus, Mr. Shaw's total offense level is 40. PSR ¶ 40.

With a total offense level of 40 and a criminal history category of I, Mr. Shaw's guideline imprisonment range is 292 to 365 months. PSR ¶ 100.

Mr. Shaw objects to proposed conditions 10 and 11 of supervised release. Mr. Shaw is not a member of the Grape Street Crips Gang. The offense was not gang related. Moreover, because Mr. Shaw will be incarcerated for a long period of time, its speculative as to whom Mr. Shaw may associate with or where Mr. Shaw may reside.

## B.   History and Characteristics

### 1.   Family Structure

Mr. Martrell Patrick Shaw was born in 2003, to Shandtrell Jones and Martin Shaw (deceased). *Ex*. A, Social History, Oct. 12, 2023, at 2. Mr. Shaw has 11 siblings. *Id*. He has six maternal half-siblings: Deshawn Jones (half-brother), Eddie Jones (half-brother), Jasmine Shaw (half-sister), Magic Jones (half-sister), ███ ███ (half-

3

1   ■), and Rontrell Shaw (half-brother). *Id*. He has two paternal half-siblings: Martin

2   Shaw, Jr. (half-brother) and Martraon Shaw (half-brother). *Id*. He has three full-

3   siblings: Cashmere Shaw (sister), Harmony Shaw (sister), and Marshai Shaw (sister).

4   *Id*.

5       Instability best describes Mr. Shaw's childhood. *Ex*. A at 2. Ms. Jones, largely a

6   single-parent, struggled to provide for her six children. *Id*. Tragically, Ms. Jones lost

7   custody of her four oldest children due to a substance use disorder. *Id*. The four

8   children were adopted and reside in Texas. *Id*. To her credit, Ms. Jones overcame her

9   substance use disorder before meeting and marrying Mr. Shaw's father. *Id*. When Mr.

10  Shaw's father was in-custody, Ms. Jones was left to care for the six children on her

11  own; when Mr. Shaw's father was out-of-custody, the financial onus was still on Ms.

12  Jones and compounded by the financial and emotional strain that accompanies a drug

13  addicted spouse. *Id*. As a result of the family's financial problems, the family moved

14  often. *Id*.

15      **2.    Mr. Shaw had an early childhood marred by poverty, community**

16          **violence, and familial instability**

17      Ms. Jones recalls that Mr. Shaw was a very quiet child who clung to her side. *Ex*.

18  A at 2. When Mr. Shaw was in kindergarten, school officials thought Mr. Shaw had an

19  intellectual disability because he did not say a word for the first three months. *Id*.

20  Testing revealed that Mr. Shaw does not have a disability. *Id*.

21      Mr. Shaw's father was incarcerated for five of Mr. Shaw's formative years. *Ex*.

22  A at 2. From ages four to nine, Mr. Shaw's father was incarcerated. *Id*. Mr. Shaw

23  recalls visiting his father three to four times a year. *Id*. In 2006, Mr. Shaw's father was

24  arrested and sentenced to 16 months for robbery. *Id*. After his release, he was re-

25  arrested within three weeks for committing another robbery. *Id*. This time he spent

26  three and half years in-custody. *Id*. at 3.

27      Mr. Shaw also "experienced multiple traumatic events stemming from chronic

28  homelessness, parental incarceration, mental illness, substance use disorders, deaths of

4

family and friends, intra-familial violence, and community violence." *Ex*. A at 3. Mr. Shaw learned unhealthy ways to cope with these traumas including maladaptive behavior, bottling emotions inside him, and substance abuse. *Id*.

Mr. Shaw and his siblings grew up in the Inland Empire. *Ex*. A at 3. Ms. Jones struggled to provide for her six children on her own, and a result, the family was often homeless. *Id*. The family frequently lived in motel rooms. *Id*. Mr. Shaw recalls his family living in a single motel room for four months. *Id*. In San Bernardino, the family witnessed and were victims of violence. *Id*. Mr. Shaw remembers there was always a gang presence. *Id*. There were robberies, fights, hit and runs, and gun violence. *Id*. Mr. Shaw felt he had to always be on the look out because someone might run up on him. *Id*.

Mr. Shaw's mother worked long hours to support her children; her absence resulted in Mr. Shaw and his siblings witnessing traumatic events. *Ex*. A at 3. ██████ ███████████████, frequently babysat Mr. Shaw and his siblings while Ms. Jones was at work. *Id*. Sadly, █████ suffers from paranoid schizophrenia and ██ often exhibited combative behavior. *Id*. ██████ would fight with Ms. Jones, family members, and even strangers. *Id*. Thus, the children saw and were part of many heated arguments with ████. *Id*. When Mr. Shaw's grandmother passed away, Ms. Jones' ████████████, went to live with Mr. Shaw's family. *Id*. Mr. Shaw recalls his █████ suffering from hallucinations, aggression, angry outbursts, and crying spells. *Id*. To alleviate ███ symptoms, █████ drank excessively. *Id*. But, ██████ drinking only exacerbated ███ symptoms. *Id*.

When Mr. Shaw was approximately nine years old, he began exhibiting disruptive behavior at school. *Ex*. A at 3. Ms. Jones sent Mr. Shaw to live with his paternal uncle, Donald Shaw, so that Mr. Shaw would have a father figure. *Id*. Mr. Shaw spent eight months living with his uncle. *Id*. During that time, his uncle took good care of him. *Id*. Mr. Shaw had his own bedroom for the first time in his life. *Id*. Mr. Shaw has fond memories of his uncle sitting him down to have discussions about

life. *Id*. Mr. Shaw felt secure with his uncle, and that his uncle provided him with structure. *Id*. There was little structure at home. *Id*. Ms. Jones often worked nights and slept during the day. *Id*. Mr. Shaw remembers staying up until 3:00 a.m. or 4:00 a.m. on school nights. *Id*. When Mr. Shaw's father was released from prison later that year, Mr. Shaw went back to his father and mother. *Id*.

### 3. Mr. Shaw's instability at home likely impacted his academic performance

Mr. Shaw recalls attending 12 different schools due to his family's housing struggles. *Ex*. A at 4. Several of Mr. Shaw's school records list his address as "homeless". *Id*. In fifth grade, Mr. Shaw was assessed for a special education plan. *Id*. Testing revealed that Mr. Shaw does not have any specific learning disabilities, but scored as low average and very low average in areas such as auditory processing, broad reading (speed of reading, ability to decode, reading comprehension), broad math (problem solving, capability with numbers, reasoning, and ability to automatically process information), and broad written language (spelling, fluency, and quality). *Id*. at 5.

### 4. Mr. Shaw's Family is Plagued with Multigenerational Trauma
### a. Ms. Jones' Traumatic History

Mr. Shaw's maternal grandmother, Patricia Riley, struggled with crack cocaine addiction. *Ex*. A at 8, 11. As a result, when Ms. Jones was three years old, she was removed from Ms. Riley's care. *Id*. Ms. Jones and her siblings were again removed from Ms. Riley's care when Ms. Jones was nine years old. *Id*. Ms. Jones and her siblings went to live with their grandmother, which Ms. Jones did not like. *Id*. Ms. Jones called her social worker and complained about the arrangement. *Id*. As a result, Ms. Jones and her siblings were removed from their grandmother's house and sent to foster homes. *Id*. Ms. Jones did not like how she was treated in the foster homes and started to run away. *Id*.

When Ms. Jones was 14-years-old and in foster care, she met Mr. Ronald Shaw and his girlfriend, Wendy (LNU). *Ex*. A at 9. At first, Mr. R. Shaw and his girlfriend hired Ms. Jones to babysit their children. *Id*. ████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████. ████████████████████████████████████ ████████████████████████████████████ ████████████████████████.

At just 17 years old, Ms. Jones was arrested for murder. *Ex*. A at 9. Mr. R. Shaw abandoned Ms. Jones during this time. *Id*. Four years later, Ms. Jones was acquitted of murder and released from custody. *Id*.

After Ms. Jones was released at 21 years old, ████████████████████ ████████████████████████████████████ ████████████████████████████████████ █████████████████████████████████████ ████████████████████████████.

During this time, Ms. Jones had four children - Deshawn, Eddie, Jasmine, and Magic. *Ex*. A at 9. Due to her addiction and other maladaptive behaviors, Ms. Jones lost custody of these children. *Id*. The four children were adopted and moved to Texas. *Id*. Losing her children motivated Ms. Jones to change. *Id*. She entered a residential treatment program. *Id*. Although she did not complete the program, she has maintained her sobriety since then, much to her credit. *Id*.

As Ms. Jones was making progress, ████████████████████████, moved in with her. *Ex*. A at 9. Ms. Jones soon became pregnant with Mr. Rontrell Shaw, Mr. Shaw's brother and co-defendant. *Id*. Ms. Jones then ended her relationship with Mr. R. Shaw. *Id*. Mr. Rontrell Shaw was 33 days old when Ms. Jones met Mr. Martin Shaw. *Id*. Ms. Jones and Mr. Martin Shaw soon began dating. *Id*. Ms. Jones recalls their

relationship was good in the beginning until Mr. Martin Shaw's drug use and infidelity created problems. *Id.*

### b.   Mr. Martin Shaw's Traumatic History

Mr. Martin Shaw was born in and grew up in South Central Los Angeles. *Ex*. A at 9. His mother worked as a nurse at night, and his father worked as a carpenter during the day. *Id*. Mr. Martin Shaw's parents struggled to financially provide for their 11 children, as well as properly supervise them. *Id*. at 9-10. As a result, Mr. Martin Shaw came and went as he pleased. *Id*.

Mr. Martin Shaw was in special education. *Ex*. A at 10. He went to the Kedren Clinic[1] once a week for a program designed for children with learning disabilities. *Id*. Other children teased Mr. Martin Shaw, and instead of enduring their taunting, Mr. Martin Shaw skipped school. *Id*.

Mr. Martin Shaw joined the Hoover Crips gang for protection. *Ex*. A at 10. He then started using marijuana and PCP with the gang. *Id*. Mr. Martin Shaw started committing robberies to support his drug habit and to buy things his family could not afford. *Id*. Consequently, Mr. Martin Shaw started to go in and out of the California Youth Authority, and eventually in and out of prison. *Id*.

Mr. Martin Shaw began his struggle with PCP when he was 15 years old. *Ex*. A at 10. He robbed and stole to support his habit, which at times was as high as $200 a day. *Id*. The only time he could maintain his sobriety was when he was incarcerated. *Id*.

Mr. Martin Shaw was married before he married Ms. Jones. *Ex*. A at 10. Mr. Martin Shaw had two children with his first wife - Martin Shaw, Jr. and Martraon. *Id*. The marriage was short due to domestic violence and Mr. Martin Shaw's drug addiction. *Id*.

---

[1] According to Kedren Health's website, since 1965 Kedren has been "[p]roviding community based mental and primary care health services for the residents of South Los Angeles and Los Angeles County." Kedren Health, Homepage, (last visited Jan. 17, 2024), https://www.kedren.org/#.

In 2001, Mr. Martin Shaw and Ms. Jones became a couple. *Ex*. A at 10. Mr. Martin Shaw tried to hide his drug use from Ms. Jones. *Id*. Due to his addiction, the family never lived anywhere longer than six months. *Id*. Mr. Martin Shaw admits he would use rent money to pay for drugs. *Id*. There were six children to care for in the house. *Ex*. A at 2. The children knew Mr. Martin Shaw was using drugs, though they never saw him use drugs. *Id*. Out of embarrassment, Mr. Martin Shaw would stay away from his family when he was high. *Id*. At times, he would stay out all night. *Id*. One time, he was gone for a month. *Id*. Tragically, Mr. Martin Shaw continued to struggle with drug addiction and was in and out of prison until his death on Jan. 31, 2022. *Id*.

### c.    Mr. Martrell Shaw's Trauma History

Over his short life, Mr. Shaw has endured many traumatic events. *Ex*. A at 6. He was 18 years old at the time of the offense, and is 20 years old now.

Mr. Shaw's father was incarcerated during Mr. Shaw's formative years. *Ex*. A at 6. Mr. Shaw recalls visiting his father in prison two to three times a year. *Id*.

Housing insecurity was a reoccurring trauma. *Ex*. A at 7. There were many times when the family of seven lived in a single-room motel room for months at a time. *Id*. There were also many times when Mr. Shaw's family lived with family and friends because they did not have housing. *Id*.

As Ms. Jones could not afford childcare for six children while she was at work, she relied on ███████████████, to babysit ██████████████. *Ex*. A at 8. ███ was not the ideal caregiver as ███ suffers from Paranoid Schizophrenia Disorder. *Id*. Mr. Shaw recalls seeing █████ experience paranoia, angry outbursts, delusions, hallucinations, and unusual behavior. *Id*. █ paranoia caused █ to fight with other people. *Id*. █ was arrested numerous times. *Id*. █ was convicted of a crime and sentenced to a 10-month custodial sentence. *Id*. █ was also committed to Patton State Hospital for five months. *Id*.

When Mr. Shaw was nine years old and at a funeral, two of his cousins got into an argument that escalated into one cousin shooting and killing the other cousin and a

woman. *Ex*. A at 7. This caused a split in Mr. Shaw's extended family, with some family member's siding with the victim and other family member's siding with the shooter. *Id*. Mr. Shaw's family moved to Fresno, California to escape the dysfunction. *Id*.

When Mr. Shaw was 12 years old, he had two traumatic events. *Ex*. A at 7. His maternal grandmother, Ms. Riley, passed away from kidney failure. *Id*. Mr. Shaw's relationship and experience with his grandmother was very different than his mother's relationship and experience with her. Mr. Shaw recalls his grandmother as a symbol of stability, and source of support. *Id*. Mr. Shaw spent a great deal of time with her. *Id*. He felt an incredible sense of loss, instability, and despair when she passed away. *Id*. The second traumatic event that year happened when one of Mr. Shaw's friends was hit by a car and died. *Id*. Mr. Shaw remembers experiencing extreme sadness and anger over the loss of his friend. *Id*.

The following year, when Mr. Shaw was 13 years old, Mr. Shaw's family discovered that ███████████████████████████████████████. ████████████████████. *Ex*. A at 7. The family had the further trauma of reporting the abuse to law enforcement, and then the arrest and conviction of the abuser. *Id*.

At 13 years old, Mr. Shaw also began to see signs of his father's substance abuse disorder. *Ex*. A at 7. Mr. Shaw recalls his father looking like a zombie. *Id*. Mr. Shaw recalls feeling disappointed and embarrassed. *Id*. He wanted nothing more than for his father to be sober. *Id*.

When Mr. Shaw was 17 years old, he experienced two more traumatic events. The first was when a friend died from a Fentanyl overdose. *Ex*. A at 7. The second was when an unidentified perpetrator shot Mr. Shaw. *Id*. at 7-8. Mr. Shaw and a cousin found a phone on OfferUp that they wanted to purchase. *Id*. at 7. They arranged to meet the seller. *Id*. When Mr. Shaw and his cousin met with the seller, the seller shot and robbed Mr. Shaw. *Id*. The perpetrators were never apprehended. *Id*. Mr. Shaw

remembers feeling helpless , and thinking he was going to die when the perpetrator pointed the gun at him. *Id*.

The next year, when Mr. Shaw was 18 years old, his sister Nat'e's longtime boyfriend and father of her children, died in a car accident. *Ex*. A at 8. Mr. Shaw saw him as a brother; he had been part of Mr. Shaw's family as long as Mr. Shaw could remember. *Id*. At his funeral, a fight broke out that led to a shooting. *Id*.

Over the following two years, Mr. Shaw lost the two most influential men in his life. *Ex*. A at 8. He lost his father on Jan. 31, 2022, and his uncle Donald in April 2023. *Id*.

Understanding the risk factors and developmental trauma Mr. Shaw experienced is critical to understanding Mr. Shaw's conduct. Studies reveal that the more risk factors a person experiences during their developmental years, the greater likelihood they commit a crime. *Ex*. A at 12; *see also* James A. Reavis, PsyD et al., *Adverse Childhood Experiences and Adult Criminality: How Long Must We Live before We Possess Our Own Lives?*, The Permanente Journal, Vol. 17, No. 2, June 1, 2013 at 1, 47 ("[c]hildhood adversity is associated with adult criminality."). Risk factors are characteristics that may show the correlation of criminal behavior in individuals that experience high instances of toxic stress. *Ex*. A at 12. Mr. Shaw experienced many risk factors such as chronic homelessness, victim of a violent crime, substance abuse, problems at school, poor parenting skills, domestic violence, familial violence and discord, low parental education, parental incarceration, substance use disorder, mental illness, and delinquent siblings. *Id*. at 13.

According to the Centers for Disease Control and Prevention, Adverse Childhood Experiences (ACEs) "can have a tremendous impact on future violence victimization and perpetration, and lifelong health and opportunity." CDC, *Adverse Childhood Experiences (ACEs)*, https://www.cdc.gov/violenceprevention/aces/index. html, (last visited Jan. 18, 2024). ACEs are potentially traumatic events that occur in childhood such as neglect (physical and emotional) and household dysfunction (mental

11

illness, incarcerated relative, substance use, divorce). *Id*. Empirical research associated with the Kaiser Permanente and Centers for Disease Control and Prevention Adverse Childhood Experiences (ACE) Study found that offenders experienced "nearly four times as many adverse events in childhood than an adult male normative sample. Eight of ten events were found at significantly higher levels among the criminal population." James A. Reavis, PsyD et al., *Adverse Childhood Experiences and Adult Criminality: How Long Must We Live before We Possess Our Own Lives?*, The Permanente Journal, Vol. 17, No. 2, June 1, 2013 at 1. Due to the many traumatic events Mr. Shaw endured, he is at greater risk of severe and persistent emotional challenges, social issues, physical health, risky health behaviors, and mental health complications. *Ex*. A at 13 citing Shanta R. Dube et al., *Childhood Abuse, Neglect, and Household Dysfunction and the Risk of Illicit Drug Use: The Adverse Childhood Experiences Study, Pediatrics*, Vol. 111, No. 2 (2003), pp. 564-72.

Mr. Shaw also experienced trauma from the community violence he witnessed. *Ex*. A at 8. Mr. Shaw witnessed fights, shootings, family dysfunction and turmoil, as well as a man killed in a motorcycle accident. *Id*. Exposure to community violence has serious health consequences. See Christopher R. Harper, PhD et al., *Witnessing Community Violence, Gun Carrying, and Associations with Substance Use and Suicide Risk Among High School Students - Youth Risk Behavior Survey, United States, 2021*, Center for Disease Control and Prevention, https://www.cdc.gov/mmwr/volumes/72/su/su7201a3.htm#suggestedcitation (last visited Jan. 18, 2024). "Witnessing community violence and firearm carrying have both been linked to increased substance use and suicide risk among youths." *Id*. "Youths who either commit or experience different forms of violence are at higher risk for perpetrating violence later in adolescence and in adulthood, and exposure to community violence is a risk factor for gun carrying." *Id*.

While not excusing Mr. Shaw's conduct, it is not surprising he then adopted some of the behaviors he was at high-risk for. Tragically, Mr. Shaw never received any of the interventions that may have helped him process the trauma he experienced, or

maladaptive behaviors modeled for him. As the Supreme Court noted, "any parent knows and as the scientific and sociological studies . . . confirm, '[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions.'" *Roper v. Simmons*, 543 U.S. 551, 569 (2005) *citing Johnson v. Texas*, 509 U.S. 350, 367 (1993). At 18-years-old, without any treatment to process his lifetime of trauma or the maladaptive behaviors modeled for him, Mr. Shaw found himself reeling from recently being shot and losing his brother. He numbed himself all day every day with a potent mix of marijuana and oxycontin. Mr. Shaw found himself doing and saying things he never did before, including this offense and his actions after.

### 5.   Mr. Shaw's Plans for the Future

Mr. Shaw writes, "I know this sounds crazy but jail saved my life. I was this very immature 18 year-old doing all these different drugs[,] my brother just died so I was carrying this heavy burden of everything so my judgment was clouded." *Ex*. B, Letter from Martrell Shaw, Jan. 3, 2024 at 2. Mr. Shaw continues, "[a]s of right now I can't say I made a whole 360 overnight but I will be working hard step by step to get there to change my life for the better." *Id*. Mr. Shaw's "goal is to acquire enough knowledge that I can pass down to my future kids, my nieces and nephews, and the community kids to stop the next misled kid from being me." *Id*.

While at MDC, Mr. Shaw has spent his time learning three new languages and studying for his GED. *Ex*. B at 2. When he is released from custody, he hopes to have his own non-profit: Guns Down, Books Up. *Id*. The non-profit will raise awareness about gun violence and provide children with school and sports supplies. *Id*. Mr. Shaw explains, "Mostly every kid where [I']m from experienced some kind of poverty[.] I just want to help end all the poverty in the world[.] Some kids live in motels, sometimes at shelter's. I[']m not using what I went through as an excuse for [the] decisions I made[,] just that all the main factors played a part in it." *Id*.

13

**C.      Nature of the Offense**

As Mr. Shaw writes:

> "I take full responsibility for my part in the crime, I can speak
> for all of us and say [the death of Mr. Michel] was never meant
> to happen. No matter what words I use it's never going to be
> enough[.] [S]omeone lost a father, son, and brother to senseless
> gun violence and [I]'m deeply sorry for my involvement. A lot
> of people w[]ere hurt in the midst of us not using our head[s]
> and making a very detrimental mistake and that mistake cost
> the victim's family a son and my family three sons. I am at a
> crossroads in my life where I don't know which route to take.
> Since being incarcerated I barely get any sleep[.] [A]ll I can
> think about [is] how sorry I am for putting myself in a situation
> where a person can do a thing like that. I am still very
> apologetic to the victim's family[.] I never had any malice
> thoughts or action towards anyone. The last almost three years
> has been the worst of my life [-] this case[,] 5 months later my
> father passes away[,] then my [] uncle passes away, then my
> other uncle and aunt passed away. I was contemplating suicide
> so many times but my mom and my siblings are the reason
> [I']m scared to do it. It's a lot for a 20 year old to deal with[.]
> I pray to [G]od every[]day for the victim and his family. I know
> how hard it is to lose someone to senseless gun violence."

*Ex*. B at 1.

While Mr. Shaw in no way disputes that he robbed Mr. Michel, he does dispute
that he shot Mr. Michel. *Ex*. B at 3. The parties agree, and the evidence shows that Mr.
Shaw was standing outside the car when Mr. Michel was shot. (Dkt. 129 at 6). Chris
Coleman, a Senior Forensic Scientist with Forensic Analytical Crime Lab as well as a

Former Deputy Sheriff Forensic Supervisor for the Contra Costa Sheriff[2], examined the shirt Mr. Michel was wearing at the time of his death. *Ex.* C, Laboratory Report, Forensic Analytical Crime Lab, Sept. 25, 2023, at 1. Mr. Coleman writes, "[t]here are two defects on the back of the t-shirt consistent with bullet holes, one on the left upper back and one on the right upper back. The holes are consistent with the bullet paths described in the autopsy report." *Id*. Mr. Coleman continues, "Smoke, soot, and smokeless powder particles were observed around the hole on the right. I examined the area around the hole visually and microscopically. The area around the hole was scorched and burned fibers could be observed." *Id*. Additionally, Mr. Coleman "processed the area chemically for vaporous lead and nitrites to visualize the gunshot residue and smokeless powder particles." *Id*. Mr. Coleman noted that "[v]aporous lead and smokeless powder particles were observed around the hole 1.5 to 2.25 inches in diameter." *Id*. Mr. Coleman concludes, "[i]t is my opinion that the gunshot to the right back of Mr. Michel's t-shirt occurred at a muzzle to surface distance between loose contact and approximately one (1) inch. The shot was very close." *Id*.

Thus, given the very close distance of the shot and that it is undisputed that Mr. Shaw was standing outside of the car at the time Mr. Michel was shot, Mr. Shaw did not shoot Mr. Michel. While Mr. Shaw's position is that Mr. Coleman's forensic report conclusively establishes that he did not shoot Mr. Michel, and the government cannot

---

[2] According to Mr. Coleman's 13-page curriculum vitae: "Chris Coleman has a BS in Forensic Science and over 27 years of experience in forensic science with city and county law enforcement agencies, including fifteen years with the Contra Costa County Sheriff's Crime Laboratory (nine as supervisor). He has been court qualified in firearms and toolmark examination, shooting incident reconstruction, crime scene processing, blood spatter interpretation, controlled substance analysis and latent print processing. He holds expertise in firearms examination, shooting reconstruction, crime scene processing and blood spatter analysis. He is a fellow of the American Board of Criminalistics and has held certifications in firearms, toolmark, distance determination and gunshot residue by the Association of Firearms and Toolmark Examiners (AFTE). He has published and extensively taught various firearms-related subjects to law enforcement, medical and legal groups, including a recurring shooting incident reconstruction class with the California Criminalistics Institute (CCI). He is a California POST certified Firearms and Force Options instructor and range master. He is also a past president of the California Association of Criminalists (CAC)." *Ex.* C, Chris Coleman curriculum vitae at 1.

refute this as the San Bernardino Police Department elected not to conduct distance determination testing, the Court need not decide this issue. Respectfully, who shot Mr. Michel is not an element of the offense, nor is it a factor under the guidelines. It is plain though, that there is strong evidence to counter the San Bernardino Police Department's conclusion that Mr. Shaw shot Mr. Michel and the Court should consider this when considering the nature of the offense and just punishment under 18 U.S.C. § 3553(a).

## D.   Needed Treatment

### 1.   Substance Abuse Treatment

Mr. Shaw admits he struggled with drug addiction and wants treatment. PSR ¶¶ 81, 85. Mr. Shaw began smoking marijuana on a daily basis at 12-years-old. *Id*. ¶ 82. When Mr. Shaw was just 17-years-old, a doctor prescribed him opiates for pain after Mr. Shaw was shot in the knee. *Id*. ¶ 84. After his sister's longtime boyfriend, who Mr. Shaw considered a brother, died, Mr. Shaw began to abuse the opiates. *Id*. Like three million other Americans[3], Mr. Shaw became addicted. When he was taken into custody, Mr. Shaw went through severe opiate withdrawals. *Id*. Mr. Shaw requests that the Court recommend to the BOP that Mr. Shaw be enrolled in the RDAP program so that he can receive help in recovery.

### 2.   Mental Health Treatment

Tragically, the adults in Mr. Shaw's life - family, doctors, teachers, school administrators, law enforcement - let Mr. Shaw slip through the cracks. Mr. Shaw did not receive early interventions to address his developmental trauma, mental health, or substance abuse. *Ex*. A at 14. Mr. Shaw is willing to participate in mental health treatment. *Id*. This shows his amenability to engage in healing. *Id*. Mr. Shaw is just 20 years old; he is still in his developmental years. *Id*. Thus, there is reason to believe that with mental health treatment, Mr. Shaw can recover from his traumas, learn to make

---

[3] Mohammadreza Azadfard, Martin R. Huecker, James M. Leaming; *Opioid Addiction,* National Library of Medicine, https://www.ncbi.nlm.nih.gov/books/ NBK448203/ (last visited Jan. 18, 2024).

conscious decisions through cognitive therapy or moral reconation therapy, and lead a law-abiding life.

### 3.   Medical Treatment

Mr. Shaw has not seen an optometrist in many years and is having trouble seeing. Mr. Shaw requests that the BOP have him examined by optometrist for glasses. Mr. Shaw is also in need of treatment to help him recover from his gunshot wound. He continues to have pain in his knee, and has limited range of motion. He requests that the BOP have a doctor examine his knee to determine if he is in need of physical therapy.

## E.   Deterrence

In terms of general deterrence, research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28-29 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." *Id.*; *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").

Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University. *See* Andrew von Hirsch et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research*, Hart Publishing, Oxford (1999), summary available at http://members.lycos.co.uk/lawnet/SENTENCE. PDF. The report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries. *Id.* at 1. It examined the effects of changes to both the certainty and severity of punishment. *Id.* While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance." *Id.* at 2 The report concluded that "the studies

17

reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id*. at 1.

The reason for this is that potential criminals are not generally aware of penalties for their prospective crimes, do not believe they will be apprehended and convicted, and do not consider sentence consequences in the manner one might expect of rational decision makers. *See* Tonry, *Purposes and Functions of Sentencing* at 28-29.

In terms of specific deterrence, a lengthy sentenced is not needed to deter Mr. Shaw. Mr. Shaw has zero criminal history points. PSR ¶ 47. Thus, he is not someone with a long history of law enforcement contacts or incarceration. Moreover, he was just 18 years old at the time of the offense, and is now just 20 years old. Thus, based on Mr. Shaw's past conduct, there is reason to believe that with proper services, he will be law-abiding going forward.

What is likely to deter Mr. Shaw from reoffending is family support, which he is very fortunate to have. Shirley R. Klein et al., *Inmate Family Functioning*, 46 Int'l J. Offender Therapy & Comp. Criminology 95, 99-100 (2002) ("The relationship between family ties and lower recidivism has been consistent across study populations, different periods, and different methodological procedures."); Phyllis J. Newton, Jill Glazer, & Kevin Blackwell, Gender, *Individuality and the Federal Sentencing Guidelines*, 8 Fed. Sent'g Rep. 148 (1995) ("[T]he better family ties are maintained[,] the lower the recidivism rate,"). Attached as *Ex*. D, are letters from Mr. Shaw's mother and siblings expressing their support for Mr. Shaw.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

# III. CONCLUSION

For the reasons discussed above, Mr. Shaw respectfully requests that the Court sentence him to 15 years of incarceration with a recommendation to the BOP that Mr. Shaw participate in the RDAP program.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: Jan. 22, 2024          By  */s/ Angela C. C. Viramontes*

ANGELA C. C. VIRAMONTES
YOUNG J. KIM
Deputy Federal Public Defenders
Attorney for Martrell Patrick Shaw

## **PROOF OF SERVICE**

I declare that I am a resident or employed in Riverside, County, California; that my business address is the Office of the Federal Public Defender, 3801 University Avenue, Suite 700, Riverside, California 92501; that I am over the age of eighteen years; that I am not a party to the action entitled above; that I am employed by the Federal Public Defender for the Central District of California, who is a member of the Bar of the State of California, and at whose direction I served a copy of the attached **MARTRELL PATRICK SHAW'S SENTENCING MEMORANDUM; EXHIBITS** on the following individual(s) by:

| [ ] Placing same in a sealed envelope for collection and interoffice delivery addressed as follows: | [ ] Placing same in an envelope for hand delivery addressed as follows: | [ ] Placing same in a sealed envelope for collection and mailing via the United States Post Office addressed as follows: | [**X**] Via Emailing same addressed as follows: |
|---|---|---|---|

**KENNETH ROTTER**
U.S. Probation Officer
Kenneth_rotter@cacp.uscourts.gov

This proof of service is executed at Riverside, California, on **January 22, 2024**.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_____.
**ISABEL RIVERA**